## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GLEN CRAIG, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:18-cv-01713-MJR-SCW |
| | ) | |
| v. | ) | **DECLARATION OF DAN BOOTH IN** |
| | ) | **SUPPORT OF DEFENDANT'S MOTION FOR** |
| POPMATTERS MEDIA, INC. | ) | **AN AWARD OF ATTORNEY'S FEES UNDER** |
| | ) | **17 U.S.C. § 505 AND 28 U.S.C. § 1927** |
| Defendant. | ) | |

I, Dan Booth, declare pursuant to 28 U.S.C. § 1746 as follows:

1.  I am counsel for PopMatters Media, Inc. ("PopMatters"), the defendant in this lawsuit. I submit this declaration in support of its Motion for an Award of Attorney's Fees Under 17 U.S.C. § 505 and 28 U.S.C. § 1927. I have personal knowledge of all facts set forth herein, unless such facts are expressly stated upon information and belief, and would testify to those facts if required to do so in this action.

2.  Glen Craig ("Craig"), the plaintiff in this action, alleges that he took a photograph of Miles Davis and owns its copyright, and that PopMatters infringed that copyright on its website.

3.  An article dated April 28, 2016 about Craig's series of Miles Davis photographs appeared on *American Photo* magazine's website at https://www.americanphotomag.com/photos-miles-davis-day-in-life. A true and correct copy of the article is filed with the Motion as Exhibit A. The article remains available online at https://www.popphoto.com/american-photo/photos-miles-davis-day-in-life/. The article reported that Craig took the photographs as part of "a prearranged assignment for *Zygote* magazine:

    In the spring of 1970, on a prearranged assignment for *Zygote* magazine, photographer Glen Craig and a music writer showed up at the home of Miles Davis on Manhattan's Upper West Side. … Over several weeks Craig photographed Davis in various settings. … Culminating with a legendary set of shows at New York's Fillmore East in June of 1970, Craig's time with Davis was an artistically fertile period [for Davis]. …

1

4. The *American Photo* article further reported that the Miles Davis box set *Miles at the Fillmore* had sparked interest in Craig's series of Miles Davis photographs:

> Miles at the Fillmore: The Bootleg Series Vol. III heavily drew on Craig's photography and created a demand for his exhibit, which debuted at Photokina 2014 and continues to travel. "Before that project these photos had sort of been tossed to the side," Craig says.

5. By an agreement dated February 18, 2014, Craig gave Sony Music Entertainment a non-exclusive license to use the Photograph and twelve of his other Davis photographs "inside the music packaging" of Legacy Recordings' Miles Davis *Fillmore* release, and further licensed the Photograph and one of the other twelve "for publicity." Paragraph 2 of the license provided that the rights Craig conveyed included the right to use the photographs in "promotional, advertising, marketing and promotional merchandising (i.e., not for resale) materials, perpetually and throughout the universe." A true and correct copy of the license is filed with the Motion as Exhibit B.

6. A press release dated January 23, 2014, on Legacy Recordings' Miles Davis website, where it remains available online at https://www.milesdavis.com/news/miles-at-the-fillmore-miles-davis-1970-the-bootleg-series-vol-3-4cd-box-set-to-be-released-march-25-2/, announced that a four-CD box set of *Miles at the Fillmore – Miles Davis 1970: The Bootleg Series Vol. 3* ("*Fillmore*"), would be released on March 25, 2014. A true and correct copy of the press release is filed with the Motion as Exhibit C.

7. One photograph attributed to Craig appears on the back cover of the *Fillmore* digipak. Twelve other photographs attributed to Craig, including the Photograph, appear in the *Fillmore* booklet. A true and correct copy of the *Fillmore* booklet is filed with the Motion as Exhibit D.

8. Upon information and belief, Legacy Recordings made the Photograph available for publicity purposes. A true and correct copy of the Photograph bearing Legacy's logo and licensing terms is filed with the Motion as Exhibit E.

9. Through his attorney Richard Liebowitz ("Liebowitz"), Craig initiated this action on September 11, 2018. PopMatters retained me to defend the action on September 19, 2018. On September 27, 2018, once PopMatters was served process, I conferred with Liebowitz by telephone, and he agreed to accept service by email of a Rule 68 offer of judgment, which I served on him by email that same afternoon. Without admitting any liability, to resolve all claims, PopMatters offered to allow judgment to be entered against it for an award of damages of $800 plus all costs then accrued to which Craig was entitled, in accordance with Federal Rule of Civil Procedure 68. A true and correct copy of an email chain beginning with my September 27, 2018 email, reflecting communications between me and Liebowitz, is filed with the Motion as Exhibit F.

10. I exchanged emails with Liebowitz on October 3, 2018. He extended a $25,000 counter-offer. I responded that PopMatters "believed that the photograph of Miles Davis was a licensed publicity photo, not an infringement." To further settlement discussions, I explained that even if the use was not under license, the profits attributable to the use, if any, would have been no more than $3.42 based on advertising revenue, and that the market value for a hypothetical license for the photograph would have been $154 or less. As I reasoned, photographs that "depict Miles Davis playing trumpet onstage in the summer of 1970, in black-and-white" are comparable to the Photograph; two such photographs were available through Getty Images; Getty's online pricing utility offered licenses for their online editorial use by a publication with a circulation of up to 50,000 for $138 for one year and $146 for two years; so a license for three years would have been available for $154. I also informed Liebowitz that the Photograph had appeared on only one page of PopMatters' website, for less than two years and five months, and that according to Google Analytics, only 886 readers had viewed that page during that period, and I reasoned that a hypothetical $154 license for three years for 50,000 readers would have more than covered the extent of PopMatters' use. I asked Liebowitz to justify and

substantiate his $25,000 counteroffer because, based on my calculations, it was more than 158 times greater than the total of any conceivable actual damages and profits. In response that evening, he asserted that the Photograph is "iconic," that Getty Images' licensing rates are "not relevant at all in this litigation," and that his counteroffer was "for statutory damages in line with what Courts feel is appropriate." The true and correct copy of the email chain filed with the Motion as Exhibit F includes my October 3, 2018 email exchanges with Liebowitz.

11. Liebowitz and I continued our email exchanges early on October 4, 2018. Referencing the November 8, 2014 copyright registration certificate filed in this action, according to which Craig's Davis photographs were then unpublished, I stated that the Photograph had not had an opportunity to become iconic since then. I cited two cases in which Liebowitz had argued that licenses available through Getty Images provided a reasonable basis for calculating damages based on a hypothetical license: *Romanowicz v. Alister & Paine*, No. 17-8937 (S.D.N.Y.) and *Terry v. Masterpiece Advertising Design*, No. 17-cv-8240 (S.D.N.Y.). I further explained to him that PopMatters would move to dismiss under Fed. R. Civ. P. 12(b)(2) and (3) unless he withdrew the claim. That email stated in part:

> Can you give me a good reason why you expect my client to defend a claim in the federal courthouse in East St. Louis? That is about 300 miles from the address you have identified, in the complaint, as PopMatters's place of business. The Dirksen Federal Building in Chicago, by contrast, is about six miles from the PopMatters address. They are not located in the Southern District by any definition and both personal jurisdiction and venue are improper. Courts in the Seventh Circuit analyze venue by treating each district as if it were its own state. A defendant must reside, or be found, in a district with which it has sufficient contacts to be rendered amenable to personal jurisdiction. Incorporation in the state, but outside the district, is insufficient. Furthermore, the copyright venue statute, 28 U.S.C. § 1400(a), governs all copyright claims, not Section 1391's general venue provision. And under Section 1400, the focus is whether the defendant resides (or may be found) in a "particular judicial district," not somewhere else in the state. *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.*, 8 F.3d 441, 445-46 (7th CIr. 1993). PopMatters resides in Chicago, maintains its sole place of business in Chicago, and transacts no business in the Southern District. The result should be obvious.

        Unless I hear from you by close of business Monday, October 8, that you will withdraw the claim from the Southern District, I will be forced to move to dismiss under Fed. R. Civ. P. 12(b)(2) and (3). You can expect to lose that motion, because suing in that District is frivolous on its face. So if you make me draft and file the motion, I promise you this: I will move for an award of every penny of attorney's fees and costs that you impose on my client by making me litigate over your obviously baseless allegations of jurisdiction and venue.

        Liebowitz replied by email half an hour later, "We are happy to transfer venue if your client wishes and will litigate in the Northern District. Please let me know and I can put together a short letter. Are you admitted in Illinois?" I responded that PopMatters had local counsel in the Northern District and would waive service of a renewed action in that court. The true and correct copy of the email chain filed with the Motion as Exhibit F includes my October 4, 2018 email exchanges with Liebowitz.

12.   By October 8, 2018, PopMatters had just ten days left to file a response to the complaint in the prior action, and Liebowitz had taken no action on his offer to transfer the prior action to this Court. I emailed him that morning, telling him among other things, "If I have to take on the senseless, wasteful costs of a motion to dismiss in the Southern District, I will also move to have you sanctioned and forced to bear the price of my services." The true and correct copy of the email chain filed with the Motion as Exhibit F includes that October 8, 2018 email message to Liebowitz.

13.   That afternoon, within an hour, Liebowitz emailed a short note to the Court stating, "We represent Plaintiff Glen Craig, in the above in captioned case. Instead of engaging in motion practice on venue, the parties respectfully request that the matter be voluntarily transferred to the Northern District of Illinois." A true and correct copy of that October 8, 2018 email and its attached note is filed with the Motion as Exhibit G.

14.   The next day, October 9, 2018, I sent Liebowitz an email explaining that his letter would not be sufficient and a motion would be required, or a notice of dismissal, in an email that stated in part:

> In the Southern District of Illinois, an email to chambers is not sufficient to request relief from the Court. A request must be filed with the Clerk of Court via ECF as a motion, unless the Court has specifically authorized filing by email. If you did not get prior approval from the Court, your unfiled email does not comply with the local rules.
>
> First, the request must be filed electronically. The Court's Electronic Filing Rules mandate that all documents must be electronically filed, and attorneys must use the ECF filing system unless specifically exempted for good cause shown. See Rules 1 and 5: https://www.ilsd.uscourts.gov/documents/ECFRules.pdf. Second, "an email to a judge's staff member is not an appropriate means of filing a document." Marlow v. Sawyer, 2018 U.S. Dist. LEXIS 47457, at n.1 (S.D. Ill. Mar. 22, 2018) (citing Fed. R. Civ. P. 5(d)(2)). And, the letter you sent did not even attempt to satisfy the standard set forth in 28 U.S.C. § 1404(a). So even if it were construed as a motion, there is no reason to expect it to be granted. The Court cannot be expected to rule on an improperly filed email, or to rule on any motion within a week.

Liebowitz responded that day, "Chambers is handling it, just spoke with them. It will be transferred and if they have any issues they will let me know today or tomorrow." A true and correct copy of those October 9, 2018 email messages and others in the same email chain is filed with the Motion as Exhibit H.

15. On October 10, 2018, I asked Liebowitz by email for his assurance that he would not to seek entry of default until at least three weeks after notice that the Southern District had acted on his request for transfer. Liebowitz responded that day, "We will agree not enter default. I will let you know when it is transferred." That same day, I also enquired with Liebowitz for more information about the copyright registration identified in the complaint in the prior action:

> While we wait, I see that Mr. Craig has several copyright registrations for photographs of Miles Davis, only one of which is at issue in the complaint: Registration No. VAu 1-192-067. Can you provide copies of the application and deposit materials so we can identify which photographs are covered by that registration?

Liebowitz did not respond to my inquiry. The true and correct copy of the email chain filed with the Motion as Exhibit H includes my October 10, 2018 email exchanges with Liebowitz.

6

16. On November 15, 2018, Liebowitz sent another email to chambers, addressed to a law clerk for the District Court Judge then presiding over this action: "Just following up on the voluntary transfer to the Northern District of IL?" The law clerk responded later that day: "You need to file a written motion, the Court does not entertain requests of this nature via our proposed documents box." A true and correct copy of those November 15, 2018 email messages, and other messages in the same email chain, is filed with the Motion as Exhibit I. Neither the docket nor my communications with Liebowitz reflect that he took any action in response to the directive to file a written motion over the following four weeks.

17. On December 12, 2018, noting that more than 90 days had passed since the complaint was filed, I told Liebowitz by email, "You are not diligently prosecuting this action," and that PopMatters would be obligated to move to dismiss if he did not file a motion to transfer by close of business on December 14, 2018. He responded later that morning, "Instead of doing the motion we are just going to refile." Within the hour I replied, urging him to file a Rule 41 notice of dismissal, stating in pertinent part:

    You may file a notice of dismissal pursuant to Fed. R. Civ. P. 41 in the Southern District.

    Please confirm that this is what you mean by "Instead of doing the motion we are just going to refile." And please confirm that by close of business Friday you will file your Rule 41 notice, or a motion to transfer, and send us a copy as filed.

    Liebowitz did not respond. The true and correct copy of the email chain filed with the Motion as Exhibit I includes my December 12, 2018 email exchanges with Liebowitz.

18. On Saturday, December 15, 2018, I confirmed via PACER that Liebowitz had not filed anything on the docket of the prior action since his notice of appearance on September 28, 2018. Having received no response confirming that Liebowitz intended to notice dismissal or move to transfer, I began to prepare a motion to dismiss for PopMatters under Rules 12(b)(2), 12(b)(3), 12(b)(6), and 41(b) of the Federal Rules of Civil

|   |   |
|---|---|
|   | Procedure, based on the lack of personal jurisdiction over PopMatters, the improper venue, Craig's failure to state a claim, and the extended failure to prosecute. I spent 15.5 hours preparing the motion between December 15 and December 17, 2018. |
| 19. | Liebowitz filed a notice of dismissal on December 17, 2018. He did not serve or provide a copy to PopMatters. The Court took note of the dismissal and closed the case on December 18, 2018. Liebowitz did not inform PopMatters that the case had been dismissed. PopMatters learned of the dismissal via PACER as I prepared to finalize the motion to dismiss. |
| 20. | Through Liebowitz, Craig refiled the action in the United States District Court for the Northern District of Illinois on August 19, 2019, where the case was denominated as Case No. 19-cv-5596. The complaint filed in that second action raised the same claim of copyright infringement, by the same use of the same Photograph, predicated on the same copyright registration, Registration No. VAu1-192-067. A true and correct copy of that complaint is filed with the Motion as Exhibit J. |
| 21. | I learned that Liebowitz had refiled the action on August 22, 2019. I emailed him that day to offer to waive service. The docket of the second action reflects that he had PopMatters served directly on August 25, 2019. In an email to Liebowitz on August 28, 2019, I outlined two of PopMatters' substantive defenses to copyright infringement that I had flagged in 2018: licensed use and invalid copyright registration. In pertinent part, I wrote: |

> Mr. Craig licensed the photo along with several others to Sony/Legacy, which published them in the booklet to the Miles Davis box set *Miles at the Fillmore*, released in March 2014. In turn, Sony/Legacy licensed the photo for promotional use by media outlets and sent the photograph to PopMatters for use online. By definition, a licensed publicity use is not an infringement. The complaint also fails to mention that when Mr. Craig obtained a copyright registration in November 2014, he falsely claimed that the photograph was part of an unpublished collection, though it had been published in connection with the *Fillmore* release. A knowing, material inaccuracy renders the registration invalid.

The same day, August 28, 2019, Liebowitz responded by email: "I accidentally put the

incorrect registration number in the complaint it should be VAu001160156. The photo was registered unpublished before the photograph was published." He also extended an offer to settle the second action for $10,000. A true and correct copy of the email chain including those August 22 and 28, 2019 email messages is filed with the Motion as Exhibit K.

22. I insisted that Liebowitz promptly file an amended complaint in the second action. He filed a lightly amended complaint in the second action on September 10, 2019, relying instead on Copyright Registration No. VAu1-160-156, which had never been identified as a basis for the action in this Court. That amended complaint was never served on PopMatters.

23. In the second action, on October 18, 2019, PopMatters filed a motion under Rule 41(d) for an order requiring Craig to pay the costs and fees PopMatters had incurred in this action that would not serve any purpose in the latter action, and staying that second action until such payment was made. The next day, Saturday, October 19, 2019, at or about 9:36 PM CDT, Liebowitz filed a one-sentence notice of dismissal in the second action. A true and correct copy of that notice is filed with the Motion as Exhibit L.

24. The United States District Court for the Northern District of Illinois closed the second action on October 21, 2019. A true and correct copy of the order noting the dismissal and terminating the second action is filed with the Motion as Exhibit M.

25. Tad Richards, a jazz critic who interviewed Craig at an exhibit of his Miles Davis series, reported that "Peter Knobler … originally commissioned the Craig photo essay." Tad Richards, *A Day in the Life of Miles Davis*, Listening to Prestige (May 7, 2016). A true and correct copy of Richards' blog post on the exhibit is filed with the Motion as Exhibit N. His post remains available online at http://opusforty.blogspot.com/2016/05/a-day-in-life-of-miles-davis.html. Peter Knobler was an editor at *Zygote*, as he stated in the

introduction to Peter Knobler & Greg Mitchell eds*., Very Seventies: A Cultural History of the 1970s from the Pages of Crawdaddy* p. 16 (Simon & Schuster 1995): "P.K. [Peter Knobler] had freelanced for the original *Crawdaddy!* and G.M. [Greg Mitchell] had written for *Rolling Stone.* We had met, appropriately enough, in 1970, the very beginning of the decade, as editors of *Zygote* magazine in New York City. (You had to be there.)"

26. A complaint filed by Liebowitz in another of Craig's copyright infringement actions identifies the Morrison Hotel Gallery as Craig's representative: "Craig is currently represented by the Morrison Hotel Gallery in New York and Los Angeles, which specializes in historical music photography." ECF No. 1 ¶ 25, *Craig v. Getty Images (U.S.) Inc.*, No. 1:17-cv-09916 (S.D.N.Y. filed Dec. 19, 2017). The bio of Craig on the Morrison Hotel Gallery website describes the genesis of his 1970 Davis series, in which he photographed Miles Davis several times culminating with the Fillmore East concerts, "for *Zygote* magazine," not independently.

> While photographing B.B. King in the late 60s, Columbia / CBS introduced Glen to Miles Davis in New York City. The record company wanted to cross Davis into a more mainstream music audience, and Glen and Miles developed a trusting relationship that allowed the photographer to photograph Davis at home, at the gym, and in the studio. Glen went on to photograph Miles in 1970 for Zygote magazine, which ran an 18-page feature on the musician, including many of the photos shown here, of three weeks Craig spent with Miles Davis, leading up to and including his performances in June 1970 at the Fillmore East.

27. The Morrison Hotel Gallery bio of Glen Craig remains available on its website at https://www.morrisonhotelgallery.com/photographers/U8B7GE/Glen-Craig. Ed Gallucci, another *Zygote* photographer, later described the process by which *Zygote* assigned work: "They would call me up and say, 'You want to go shoot Rod Stewart? You want to go shoot Muhammad Ali?' I was hooked up with a writer and they would send us out to do an interview." He also explained that he had been hired as a freelancer for  as a freelancer for *Zygote* by editor Peter Knobler. Mr. Gallucci's description of that process remains

10

available on his website at http://www.edgallucciphotography.com/site/wp-content/uploads/2013/10/gallucci-Independent9-20-copy.pdf.

28. *Zygote* launched in 1970 and covered post-Woodstock music and counterculture in the shadow of such precursor magazines as *Crawdaddy!* and *Rolling Stone* until folding in 1971, after ten issues. The fifth issue of *Zygote* featured an interview with Miles Davis as the cover story, including more than a dozen photographs from Craig's Davis series. "The Prince of Darkness Also Brings Light," *Zygote* vol. 1 no. 5 pp. 25-40 (Aug. 12, 1970). The author of the profile was not credited in that issue. The profile indicates that at each site where Craig photographed Miles Davis that June—Davis' home, his recording studio, Gleason's Gym, and finally the Fillmore East—the author accompanied him. Upon information and belief, Peter Knobler wrote the profile and commissioned Craig to photograph the Davis series for *Zygote* magazine as a work for hire.

29. Law360 published an article by Bill Donahue about Liebowitz on October 11, 2019 entitled, "*As 'Copyright Troll' Turns National, Will Blowback Follow?*," which remains available online at https://www.law360.com/articles/1208101. A true and correct copy is filed with the Motion as Exhibit O. According to that article, Liebowitz is "easily the most prolific copyright attorney in the nation" after filing 403 copyright cases in 2017, 461 in 2018, and 668 in 2019 as of October 10, 2019.

30. According to a PACER search I conducted today, Liebowitz filed another 54 copyright cases in October after the Law360 article, from October 11 through October 31, 2019, bringing his tally up to at least 722 copyright cases filed in 2019 through October. Also according to PACER, 4,363 copyright suits were filed nationwide in 2019 through October. Accordingly, Liebowitz is behind more than 16.54 percent, or nearly one-sixth, of all copyright actions initiated in the United States so far in 2019.

31. By this Motion, PopMatters seeks an award of all attorneys' fees it incurred in this action, whether assessed as costs recoverable under 17 U.S.C. § 505 or "excess" attorneys' fees

        under 28 U.S.C. § 1927. PopMatters' attorneys' fees have been reasonable and reasonably incurred. PopMatters spent a reasonable amount of time on the issues Craig raised and abandoned in this action. Filed herewith as Exhibit P is a true and correct itemized statement of attorney services, based on contemporaneous billing records, that accurately reflects work I have performed on behalf of PopMatters in connection with this action, for which PopMatters seeks to recover its incurred attorneys' fees by this Motion. I personally extracted all data from the client billing records and organized the information into the statement filed as Exhibit P. The statement reflects the dates the work was performed, a detailed description of the work performed, and the time expended to the nearest tenth of an hour.

32.    The time recorded in Exhibit P was reasonably incurred. Throughout my representation of PopMatters, I have strived to minimize fees, costs and expenses and avoid any unnecessary hours or duplication of effort. I have personally reviewed the time records being submitted in this Motion and eliminated entries that might potentially be seen as excessive, duplicative, or unproductive. PopMatters' counsel staffed and managed the litigation as efficiently as possible and did not duplicate responsibilities. In the exercise of billing discretion, I have excluded all time from the statement of services for associates' work on this matter. After my careful review of the time records, I believe all of the time PopMatters is submitting for compensation was necessitated by Craig and Liebowitz's improper filings, and by Liebowitz's dilatory tactics and belated attempts to rectify those filings. In the second action, in support of PopMatters' motion for attorneys' fees under Rule 41(d), I submitted a less complete record of my time worked in this action than is submitted herewith. The difference is because PopMatters now seeks an award of all fees expended in this action; while in the Rule 41(d) motion, PopMatters sought only compensation for time incurred in this action that would necessarily serve no purpose in the second action, such as time spent addressing personal jurisdiction and

venue, and issues raised by the copyright registration that, after dismissing this action, Liebowitz conceded did not apply to the Photograph. All time entries from 2018 that were not claimed in the Rule 41(d) motion are italicized in Exhibit P.

33. I have practiced as a civil litigator since 2005, when I received my Juris Doctor degree from Columbia Law School. I served as a litigation associate at Hughes Hubbard & Reed LLP in New York from 2005 to 2007 and at Goodwin Procter LLP in Boston from 2007 to 2009, and as a co-founder and partner at Booth Sweet LLP from 2010 to 2019 before launching Dan Booth Law LLC this year. I have substantial experience in intellectual property litigation, which has been the primary focus of my legal practice since 2007. Since 2010, my practice has been concentrated on litigation of intellectual property and free speech issues, chiefly involving copyrights, trademarks, domain name disputes, defamation, and intermediary liability issues.

34. I have charged PopMatters for my services at my standard rate of $425 per hour. That rate, agreed upon with PopMatters, is well within the usual range charged in intellectual property litigation by similarly experienced attorneys in this Court. In 2013, in my first case in this Court, involving copyright-related claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, my client Anthony Smith was awarded his fees under 28 U.S.C. § 1927 at the $409 per hour rate I then charged. *Lightspeed Media Corp. v. Smith*, No. 12-cv-889, 2013 U.S. Dist. LEXIS 168615, *19 (S.D. Ill. Nov. 27, 2013), *aff'd*, 761 F.3d 699 (7th Cir. 2014). The District Court Judge presiding in that case commented, "that's what you call bargain rates around here." *Id.*, ECF No. 101 at 17:11-13 (S.D. Ill. filed Dec. 10, 2013) (hearing transcript). My current billing rate of $425 per hour represents only a modest increase from the $409 per hour rate awarded in that case six years ago. It is also a reasonable rate in light of the rate charged by plaintiff's counsel Liebowitz for copyright litigation in this judicial district. In another case in this Court, Liebowitz identified himself as a 2015 law school graduate and claimed an hourly rate of

  $375 per hour. Declaration of Richard Liebowitz ¶¶ 18-19, *Ward v. Consequence Holdings, Inc.*, No. 3:18-cv-01734-NJR-MAB (S.D. Ill. filed Apr. 22, 2019).

35.  Overall, by this motion, PopMatters seeks to recover $37,995 of the attorney's fees it has incurred and expended under Rule 41(d), for 89.4 hours of my time at $425 per hour. That includes all 60.2 hours incurred on the case while it was in this Court, before the December 2018 notice of dismissal, and 29.2 hours of time incurred preparing the Motion for Attorney's Fees, which is also compensable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2019.

              /s/ Dan Booth

              Dan Booth (*pro hac vice* admission pending)
              Dan Booth Law LLC
              60 Thoreau Street #121
              Concord, MA 01742
              dan@danboothlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this November 4, 2019, the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be served via first-class mail to any identified non-registered participants for whom a mailing address is provided.

/ s /  Scott Kane Stukel